*640
 
 OPINION OF THE COURT
 

 Bellacosa, J.
 

 In 1990, plaintiff, at age 16, was seriously hurt as she entered about 3 feet of water from a Bayliner water-ski boat anchored approximately 15 feet offshore. Her injuries were caused by a cleat affixed to the boat. Plaintiff’s complaint alleges that the cleat was defectively designed and positioned, and that the boat was defectively manufactured due to the lack of nonskid material and a handrail. Defendants-appellants include the boat’s designer, manufacturer and distributor, and the designer, manufacturer and distributor of the cleat. Other defendants are plaintiff’s companion, who operated the boat, and his father, who owned the boat.
 

 Supreme Court and the Appellate Division denied defendants’ (Bayliner and Perko) respective motions to dismiss. Our courts held that Federal admiralty law (which has no infancy tolling protection against its three-year Statute of Limitations) did not govern this tort action. Therefore, the New York courts held that New York State’s tolling provision against the running of the Statute of Limitations left plaintiff’s action timely
 
 (see,
 
 CPLR 214, 208). The Appellate Division granted defendants leave to appeal to our Court on a certified question. We now reverse, answer the question in the negative and grant the motion to dismiss the complaint, as barred by 46 USC, Appendix § 763a.
 

 Despite a complicated procedural path, the dispositive issue for us to resolve in this case is relatively straightforward.
 
 *641
 
 We must decide whether Federal maritime law governs, based on pertinent United States Supreme Court precedents and principles. We conclude that it does and that the New York State Supreme Court applied an overly narrow test for resolving the threshold question. It reasoned that "[p]laintiff was injured on a pleasure boat, that is, a craft having no relationship to the traditional and most significant concern of admiralty jurisdiction — the protection of those engaged in commerce.” Additionally, the nisi prius court noted that "while Huntington Bay may constitute navigable waters, the boat was at rest very close to the shore, and the individuals on board were using it for purely recreational purposes.” The Appellate Division affirmed for the reasons stated by Supreme Court, with one Justice concurring and dissenting in part (224 AD2d 353).
 

 We must first look to the test promulgated by the United States Supreme Court for determining the nature and classification of a maritime tort. Its teaching governs the exclusive, preemptive and applicable admiralty jurisdiction. Historically, "[i]f the wrong occurred on navigable waters, the action is within admiralty jurisdiction”
 
 (Executive Jet Aviation v City of Cleveland,
 
 409 US 249, 253 [1972]). In that case, involving the crash-landing and sinking of a jet aircraft in Lake Erie, admiralty jurisdiction was found lacking. The United States Supreme Court concluded that admiralty jurisdiction applies when the wrongs (1) "occurred on navigable waters,” and (2) "bear a significant relationship to traditional maritime activity”
 
 (id.,
 
 at 253, 268). The reasoning and test as to the second prong, which constitutes an extension of the more venerable "locality” rule, are deemed "far more consistent with the history and purpose of admiralty”
 
 (id.,
 
 at 268). This reflected the United States Supreme Court’s "first clear departure from the strict locality test”
 
 (Sisson v Ruby,
 
 497 US 358, 361).
 

 In
 
 Foremost Ins. Co. v Richardson
 
 (457 US 668 [1982]), a case involving the collision of two pleasure boats on a river in Louisiana, the United States Supreme Court determined that "the
 
 Executive Jet
 
 requirement that the wrong have a significant connection with traditional maritime activity is not limited to the aviation context”
 
 (id.,
 
 at 674). It definitively declared that
 
 Executive Jet’s
 
 "rationale in rejecting a strict locality rule also applies to the maritime context”
 
 (id.,
 
 at 673). In
 
 Foremost,
 
 the Court stated that ”[b]ecause the 'wrong’ here involves the negligent operation of a vessel on navigable waters, * * * it has a sufficient nexus to traditional maritime activity to
 
 *642
 
 sustain admiralty jurisdiction”
 
 {id.,
 
 at 674). Significantly, the Court focused on "[t]he potential disruptive impact of a collision between boats on navigable waters”
 
 {id.,
 
 at 675). Pertinently to the problem before us, the United States Supreme Court expressly rejected the notion that admiralty jurisdiction applies only to commercial maritime activity, or, more specifically, "commercial” boats, as contrasted to "pleasure” boats
 
 {id.,
 
 at 674-675).
 

 In
 
 Sisson v Ruby
 
 (497 US 358 [1990],
 
 supra),
 
 the Supreme Court added that maritime jurisdiction obtained when a pleasure yacht was destroyed by fire while docked at a Lake Michigan marina, destroying the yacht and damaging the marina and several vessels moored nearby
 
 (id.,
 
 at 360). The Supreme Court again invoked the "potentiality” linchpin and reasoned that "such a fire has a potentially disruptive impact on maritime commerce, as it can spread to nearby commercial vessels or make the marina inaccessible to such vessels”
 
 (id.,
 
 at 362). In rejecting the argument that the "potential” effect on maritime commerce was minimal because no commercial vessels were docked at the marina when the fire occurred, the Supreme Court stated:
 

 "We determine the potential impact of a given type of incident by examining its general character. The jurisdictional inquiry does not turn on the
 
 actual
 
 effects on maritime commerce of the fire on Sis-son’s vessel; nor does it turn on the particular facts of the incident in this case, such as the source of the fire or the specific location of the yacht at the marina, that may have rendered the fire on the [yacht] more or less likely to disrupt commercial activity. Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity”
 
 {id.,
 
 at 363 [emphasis in original]).
 

 In light of the above explanation, the
 
 Sisson
 
 Court turned to the second half of the
 
 Foremost
 
 test, "under which the party seeking to invoke maritime jurisdiction must show a substantial relationship between the activity giving rise to the incident and traditional maritime activity”
 
 (id.,
 
 at 364). The Court stated that the first step in this analysis involves defining the relevant activity
 
 (id.).
 
 Characterizing the "activity” by the "general conduct” from which the incident arose, as opposed to
 
 *643
 
 the "particular circumstances,” the Court concluded that it "need not ascertain the precise cause of the fire to determine what 'activity’ Sisson was engaged in; rather, the relevant activity was the storage and maintenance of a vessel at a marina on navigable waters”
 
 (id.,
 
 at 364-365). The second inquiry of the maritime connection test, according to the Supreme Court, is whether the activity has the requisite relationship with traditional maritime activity. Building on its other modern enlargements of the maritime jurisdictional circumference, the Supreme Court rejected the contention that only pure navigation should be characterized as substantially related to traditional maritime activity. It tied its precedents together with a core, policy line: "The need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial”
 
 (id.,
 
 at 367).
 
 Sisson's
 
 application and holding thus wound up with the conclusion that "the storage and maintenance of a vessel at a marina on navigable waters is substantially related to 'traditional maritime activity’ given the broad perspective demanded by the second aspect of the
 
 [Executive Jet
 
 — Foremost\ test”
 
 (id.,
 
 at 367).
 

 Jerome B. Grubart, Inc. v Great Lakes Dredge & Dock Co.
 
 (513 US 527) rounds out the analysis for present purposes. There, the Supreme Court found admiralty jurisdiction over an action brought by a barge owner to limit its liability for damages resulting from the flooding of a freight tunnel running under a navigable river. The damage allegedly resulted from the negligent use of a crane on a barge to drive piles into a riverbed above the tunnel. The Court first determined that the locality test was met because the incident involved a "vessel” on navigable waters
 
 (id.,
 
 513 US, at 535). The "vessel” there was a barge fastened to the river bottom for use as a work platform
 
 (id.).
 
 The Court reasoned that "at other times it was used for transportation”
 
 (id.,
 
 513 US, at 535). The Court then applied its variation of the
 
 Sisson
 
 two-step analysis to determine whether the maritime nexus test was satisfied
 
 (id.,
 
 513 US, at 538-540). The Court resolved that the incident had a potential to disrupt maritime commerce, reasoning that "damaging a structure beneath the river bed could lead to a disruption in the water course itself’ and that "damaging a structure so situated could lead to restrictions on the navigational use of the waterway during required repairs”
 
 (id.,
 
 513 US, at 539). The Court finally concluded that the "activity giv
 
 *644
 
 ing rise to the incident” — "repair or maintenance work on a navigable waterway performed from a vessel” — had a substantial relationship to a traditional maritime activity
 
 (id.,
 
 513 US, at 539, 540). Owning up to "the difficulty of escaping the [admiralty] case law,” the Supreme Court in
 
 Grubart
 
 candidly observed that although "these cases do not say that every tort involving a vessel on navigable waters falls within the scope of admiralty jurisdiction no matter what, they do show that ordinarily that will be so”
 
 (id.,
 
 513 US, at 543).
 

 The plain reading and application of these Supreme Court precedents leads to the inescapable conclusion that Federal admiralty jurisdiction governs the instant controversy. The binding force of the admiralty jurisprudence is illustratively manifest in consistent applications of the sweeping
 
 Executive Jet
 
 test, appreciated more fully together with its ensuing, ever-widening Supreme Court precedents
 
 (see, e.g., White v United States,
 
 53 F3d 43 [security guard lost her balance when stepping on platform at end of gangway, on disembarking public vessel docked at pier at naval base];
 
 Mink v Genmar Indus.,
 
 29 F3d 1543 [passenger slammed into deck of craft as it was being operated at a high rate of speed];
 
 Butler v American Trawler Co.,
 
 887 F2d 20 [passenger injured while attempting to board docked ship]).
 

 We now turn to our application of these principles and precedents. As Huntington Bay is surely a navigable body of water, the locality test, the first prong under
 
 Executive Jet
 
 and
 
 Foremost,
 
 is readily satisfied. The second prong, maritime connection, as applied by
 
 Grubart,
 
 involves another two-step inquiry
 
 (Jerome B. Grubart, Inc. v Great Lakes Dredge & Dock Co.,
 
 513 US 527, 538-540,
 
 supra).
 
 The first is whether the incident involved had the potential to disrupt maritime commerce
 
 (id.).
 
 Examining "general features” as required by
 
 Sis-son,
 
 the type of incident that occurred here is demonstratively "likely to disrupt commercial activity”
 
 (Sisson v Ruby,
 
 497 US 358, 363,
 
 supra).
 
 No sustainable analysis or method to escape the force of the United States Supreme Court’s precedents, centering on potentiality of interference with maritime commerce, are present here. On the contrary, that key potentiality is plainly operative under the facts of this case, given the nature and manner of the accident, which resulted from an allegedly defective apparatus on the boat. "[0]ne of the purposes of admiralty law is to protect sailors from defective equipment while they are engaged in maritime activity”
 
 (Hassinger v Tideland Elec. Membership Corp.,
 
 781 F2d 1022, 1028).
 
 *645
 
 Therefore, placing a vessel into navigable water with a defect sufficiently carries the potential to disrupt maritime commerce by creating a hazardous situation to nearby vessels and all those engaged in maritime activity. Additionally, the existence of a dangerous and, possibly, injurious situation "could lead to restrictions on the navigational use of the waterway”
 
 (Jerome B. Grubart, Inc. v Great Lakes Dredge & Dock Co.,
 
 513 US 527, 539,
 
 supra).
 
 Thus, in light of the breadth of this prong of the test, this case qualifies as potentially disruptive of maritime commerce.
 

 The second step addresses "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity”
 
 (id.,
 
 513 US, at 539). The operation of boats in navigable waters plainly fits within the substantial relationship test
 
 (see, Foremost Ins. Co. v Richardson,
 
 457 US 668, 674,
 
 supra),
 
 as does storing them at a marina
 
 (see, Sisson v Ruby,
 
 497 US 358, 360,
 
 supra).
 
 Therefore, the factual allegations of this case — a vessel and incident on the navigable waters of Huntington Bay — neatly and easily fall within the United States Supreme Court’s sweeping maritime nexus prerequisite.
 

 Concluding that the instant case is a Federal admiralty matter, we must then accept the Federal Statute of Limitations, which is designed to effectuate the congressional intent of a uniform standard (46 USC, Appendix § 763a;
 
 see,
 
 HR Rep No. 737, 96th Cong, 2d Sess 1-2, reprinted in 1980 US Code Cong & Admin News 3303;
 
 Mink v Genmar Indus.,
 
 29 F3d 1543, 1547,
 
 supra; Butler v American Trawler Co.,
 
 887 F2d 20, 22,
 
 supra).
 
 In
 
 Lerner v Karageorgis Lines
 
 (66 NY2d 479), the New York Court of Appeals noted that "[i]n maritime cases, State courts must apply Federal law 'to secure a single and uniform body of maritime law’ ”
 
 (id.,
 
 at 484-485 [quoting
 
 Matter of Rederi (Dow Chem. Co.),
 
 25 NY2d 576, 581,
 
 cert denied
 
 398 US 939]). We further noted in
 
 Lerner
 
 that "[a] State court may not limit a party’s substantive rights by applying its own procedural rules if those rules would 'significantly affect the result of the litigation, i.e., would be outcome determinative’ ”
 
 (Lerner v Karageorgis Lines, supra,
 
 66 NY2d, at 485 [quoting Matter
 
 of Rederi, supra,
 
 25 NY2d, at 581]). With that guidance, we note that applying the New York State Statute of Limitations
 
 (see,
 
 CPLR 214) and its accompanying tolling provisions
 
 {see,
 
 CPLR 208) here would generate the sort of nonuniform procedural bar that we have disavowed.
 

 
 *646
 
 The United States Supreme Court, moreover, has noted that although State courts are authorized to entertain maritime causes of action, "the extent to which state law may be used to remedy maritime injuries is constrained by a so-called 'reverse-
 
 Erie’
 
 doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards”
 
 (Offshore Logistics v Tallentire,
 
 477 US 207, 223;
 
 see, East Riv. S. S. Corp. v Transamerica Delaval,
 
 476 US 858, 864 ["(w)ith admiralty jurisdiction comes the application of substantive admiralty law”];
 
 but see, Yamaha Motor Corp. v Calhoun,
 
 516 US 199, —, 116 S Ct 619, 623 [citations omitted] ["(t)he exercise of admiralty jurisdiction * * * 'does not result in automatic displacement of state law’ ”]).
 

 On a related aspect of this case, we are also satisfied that the exceptional Federal equitable tolling remedy is inapplicable to this case. Plaintiff and the partial dissent opinion at the Appellate Division mistakenly rely on
 
 Maxwell v Swain
 
 (833 F2d 1177) for the proposition that "[w]here suit has been filed within the period of limitation, a defendant has been put on notice of the claim, and service is effected within a reasonable time, there is little to be gained by refusing to toll the federal limitation because actual service of process was not achieved within the statutory period”
 
 (id.,
 
 at 1178). The
 
 Maxwell
 
 court, however, expressly limited its holding tó a lawsuit filed in a State court lacking venue
 
 (id.).
 
 No such circumstance is present or proffered here.
 

 "Federal courts have typically extended equitable relief only sparingly”
 
 (Irwin v Department of Veterans Affairs,
 
 498 US 89, 96). The well-settled and limited circumstances for equitable tolling of the Statute of Limitations are summarized as follows: (1) the plaintiff timely filed the complaint in the wrong forum
 
 (see, Burnett v New York Cent. R. R. Co.,
 
 380 US 424;
 
 Herb v Pitcairn,
 
 325 US 77;
 
 Maxwell v Swain,
 
 833 F2d 1177,
 
 supra; see also, American Pipe & Constr. Co. v Utah,
 
 414 US 538), (2) the defendant actively misled the plaintiff
 
 (see, Glus v Brooklyn E. Term.,
 
 359 US 231;
 
 Holmberg v Armbrecht,
 
 327 US 392), or (3) the plaintiff in some extraordinary way had been prevented from complying with the limitations period
 
 (see, Osbourne v United States,
 
 164 F2d 767).
 

 This case does not qualify under any of these distinctly exceptional circumstances. In fact, Federal courts "have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights”
 
 (Irwin v Department of Veterans Affairs,
 
 498 US
 
 *647
 
 89, 96,
 
 supra
 
 [citing
 
 Baldwin County Welcome Ctr. v Brown,
 
 466 US 147, 151]). The extraordinary Federal equitable tolling remedy is thus not available to the plaintiff in this matter.
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, motions by the Bayliner defendants and the Perko defendants to dismiss the complaint as against them granted, and the certified question answered in the negative.
 

 Chief Judge Kaye and Judges Titone, Smith, Levine, Ciparick and Wesley concur.
 

 Order reversed, etc.