**Victor Francis BARCLAY, Plaintiff,**

v.

**KEYSTONE SHIPPING COMPANY, Defendant.**

**No. CIV.A.00–1572.**

United States District Court,
E.D. Pennsylvania.

Jan. 11, 2001.

---

Allen C. Welch, Costopolous & Welch, Harrisburg, PA, for plaintiff.

Jeffrey S. Moller, James J. Reynolds, Blank, Rome, Comisky & McCauley, LLP, Philadelphia, PA, for defendant.

## MEMORANDUM & ORDER

KATZ, Senior District Judge.

Plaintiff Victor Francis Barclay joined the oil tanker M/T Ocean City as a QMED (qualified member of the engineering department) in late November 1998 under a contract, also known as articles of agreement, to serve 120 days aboard the vessel. The Ocean City is operated by defendant Keystone Shipping Company and, during the time relevant to this action, traveled between Singapore, Kuwait, and Australia. Mr. Barclay left the Ocean City in Australia on February 25, 1999, prior to the expiration of his contract, under circumstances that give rise to the instant action. Now before the court is Keystone's motion for summary judgment.

### I. Background [1]

During the course of the voyage, relations between Mr. Barclay and some members of the crew deteriorated. In particu-

---

1. The facts are drawn from the submissions of the parties. Where the facts are disputed,

lar, Mr. Barclay's relationship with the chief engineer, his supervisor, became tense. Mr. Barclay felt that he was singled out for harassment and that the chief engineer acted in a threatening manner towards him. Mr. Barclay states, however, that the chief engineer never made a specific threat of physical violence or took any physical action against him.[2] *See* Barclay Dep. at 72 (stating no one "verbally threatened me face to face" but that he felt intimidated by the chief engineer because of "the way the man walks by me and makes faces and keeps his arms and bounces off you in between small passageways in the engine room."); *see also* Barclay Dep. at 268 (affirming that the chief engineer never struck him). In addition to the harassment by chief engineer, other members of the engineering department made racially derogatory comments in Mr. Barclay's presence. None of these remarks were directed to Mr. Barclay. *See* Barclay Dep. 54–56.[3] He was also harassed by the captain.

As part of his duties aboard the ship, Mr. Barclay was assigned to stand watch twice a day. He contends that the chief engineer required him to begin working a half an hour before his assigned watch and that, under his contract, this extra half-hour constituted an hour of overtime per watch. The chief engineer denies directly ordering members of his staff to begin watch a half hour early. Mr. Barclay has not been paid for this alleged overtime.

During the course of the voyage, Mr. Barclay came to believe that conditions abroad the Ocean City were unsafe. In particular, he was concerned because the immersion suit[4] he was issued was too small. Although the ship apparently carried at least one jumbo-sized suit, no one was able to locate it. Keystone eventually provided a properly-fitting suit shortly before Mr. Barclay left the Ocean City in Australia. Mr. Barclay also believed that a temporary repair to the ship's jacking gear rendered the mechanism unsafe,[5] that

either the dispute is noted, or the facts are drawn in a light most favorable to the plaintiff.

2. In arguing that he was under threat of imminent physical harm from the chief engineer, Mr. Barclay relies on statements by the chief engineer that he wanted to "throttle" Mr. Barclay and another crew member and that the chief engineer "wouldn't mind kicking their ass." *See* Feldman Dep. at 105–06; Feldman Ex. 16. The throttling statement appears in the chief engineer's written summary of events surrounding Mr. Barclay's departure, Feldman Ex. 16, which was created the day after Mr. Barclay left the Ocean City. The pertinent portion of Feldman Ex. 16, which relates to a meeting between the captain, the chief engineer, Mr. Barclay, and another member of the engineering department prior to Mr. Barclay's departure, is as follows:

In the meeting I was attacked as a person and as a C/E department head. I took all the accusations[,] disputed what I could, kept my cool and remained professional. I wanted to throttle both of those lying, whining bastards. I was so humiliated and hurt by the lack of support from the captain [that] I wrote him a letter and told him so.

A fair reading of Feldman Ex. 16 indicates that the throttling statement was a description

of the chief engineer's internal, emotional reaction to Mr. Barclay's accusations of ill-treatment rather than a concrete threat that was verbalized to Mr. Barclay. Similarly, the "ass-kicking" statement was made during the chief engineer's deposition and was his attempt to describe what he meant by "throttle" in Feldman Ex. 16. *See* Feldman Dep. at 106.

The court notes that Feldman Ex. 16 is unnumbered and that the copy submitted with the plaintiff's response to the summary judgment motion appears to be missing the page containing the throttling. The copy of Feldman Ex. 16 submitted as a trial exhibit appears to be complete.

3. The record does not reveal Mr. Barclay's race. He states, however that he is of Portuguese descent, has relatives from Cape Verdes, and that racially derogatory remarks personally offended him. *See* Barclay Dep. at 54.

4. An immersion or survival suit is a neoprene rubber suit that is designed to be worn over a seaman's clothing in case of an emergency that requiring the seaman to abandon ship.

5. The jacking gear is designed to turn the ship's engine slowly after the engine has been shut down to allow it to cool evenly and

the method used for making potable water while in port was unsafe, and that the bilge pump was discharging oily slops. The defendant does not agree that the jacking gear was unsafe, that potable water was being made improperly or that oily slops were discharged from the Ocean City.

In addition, Mr. Barclay asserts that his quarters were entered without his consent. The captain admitted that he entered the plaintiff's quarters when he was searching for an immersion suit for the plaintiff and as part of his routine sanitary inspections. The chief engineer admitted that he entered Mr. Barclay's quarters on two occasions to check for a water leak.

The allegedly unsafe conditions aboard the ship, coupled with the harassment, caused Mr. Barclay to become emotionally upset and to believe that his life was in danger. As a result, shortly before the ship docked in Kuwait, Mr. Barclay informed the captain that he wished to leave the vessel. The captain warned him that such an act would be considered desertion; that he would get no assistance from the captain; that it would take at least five days for Mr. Barclay to get a visa to enter Kuwait and that he probably would have to wait on the boat basin until he procured one; and that Keystone would not pay for Mr. Barclay's transportation back to the United States or provide him with his unpaid wages, as it would be required to do if Mr. Barclay was discharged by mutual consent. Nevertheless, when the Ocean City arrived in Kuwait, Mr. Barclay and a shipmate left the vessel to consult with a United States consular officer. After this meeting, Mr. Barclay voluntarily returned to the ship. He admitted that he did not leave the Ocean City at that time because he was concerned about the difficulties he would face if he quit the vessel without the captain's consent. *See, e.g.,* Barclay Dep.

at 100, 105–06, 167–69. He also admitted that he was not physically restrained in any way. *See id.* at 129.

When the ship reached Australia, Mr. Barclay again resolved to leave the vessel because of his concerns regarding the operation of the vessel and the harassment by other members of the crew. He went ashore on at least one occasion to arrange transportation back to the United States and to make a telephone call to the United States Consulate,[6] and freely returned to the vessel after completing these tasks. Mr. Barclay was able to leave the ship even though he did not have his passport. *See* Barclay Dep. at 175. The captain held the passports of all crew members and did not release Mr. Barclay's until he was directed to do so, via fax, by a United States consular officer. The captain also refused to discharge Mr. Barclay by mutual consent. After receiving his passport, Mr. Barclay was escorted off the Ocean City by an Australian customs officer. Although the captain spoke to a consular officer by telephone, no United States officer visited the Ocean City while it was in Australia to investigate Mr. Barclay's claims that the vessel was unsafe. At no time while the ship was docked in Australia was Mr. Barclay physically restrained aboard the ship. *See* Barclay Dep. at 175.

After this incident, Keystone personnel wrote several letters and a report to the Coast Guard stating the company's position that Mr. Barclay had deserted the Ocean City in Australia. The Coast Guard conducted an investigation of this claim, as well as of Mr. Barclay's claim that his departure was justified because the Ocean City was unsafe. The Coast Guard closed the investigation without making any findings regarding any of the allegations. Keystone personnel also drafted a report regarding the incident for submission to the Marine Index Bureau (MIB).[7] In this

---

before the engine is started to allow it to warm evenly. *See* Matlack Dep. at 41.

**6.** It is unclear from the record exactly how many times Mr. Barclay left the Ocean City in

Australia to facilitate his permanent departure from the ship.

**7.** The MIB collects data pertaining to personal injury claims by employees in the marine,

draft report, it characterized Mr. Barclay's departure as a desertion. This report was never sent to the MIB. *See* Def. Ex. J (Aff. of D. Kennedy, Vice President, MIB, stating that the agency has never received a report from the defendant regarding an alleged desertion from the Ocean City). Apparently, a copy of the draft MIB report was placed in Keystone's file.

Mr. Barclay brings numerous claims against Keystone. He first seeks one month's wages under a statutory provision regarding the discharge of a seaman in a foreign port (count one). He brings four intentional tort claims: one count of intentional infliction of emotional harm (count two), one count of false imprisonment (count three), and two counts of invasion of privacy (counts four and eight). He claims that he is owed overtime pay under his marine contract (count five), and finally, he brings defamation claims of libel (count seven) and slander (count eight).[8]

## II. Discussion [9]

### A. Wages on Justified Complaint

Mr. Barclay first seeks compensation under 46 U.S.C. § 11106(a), which provides:

> insurance, and energy industries. The goal of this service is to detect fraudulent claims. *See* Def. Ex. I (Kennedy Aff.)

**8.** Keystone has filed a counterclaim against Mr. Barclay, alleging that he breached his contract by deserting. Keystone asserts that Mr. Barclay's departure left the Ocean City undermanned and the ship was delayed in sailing from Australia until he was replaced. Keystone seeks damages for the cost of flying a replacement crew member to Australia and as well as damages related to the delay.

**9.** Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). At the summary judgment stage, the court does not weigh the evidence and determine the truth of

Before a seaman on a vessel of the United States is discharged in a foreign country by a consular officer on the seaman's complaint that the agreement required by this part has been breached because the vessel is badly provisioned or unseaworthy, or against the officers for cruel treatment, the officer shall inquire about the complaint. If satisfied of the justice of the complaint, the consular officer shall require the master to pay the wages due the seaman plus one month's additional wages and shall discharge the seaman. The master shall provide the seaman with employment on another vessel or provide the seaman with passage on another vessel to the port of original engagement, to the most convenient port of the United States, or to some port agreeable to the seaman.

*Id.* In interpreting a substantially similar earlier version of section 11106, the Supreme Court held that "it is plain that by its provisions the Consul or Consular Agent is made the arbiter of the seaman's demand for the month's extra wages and for other relief which it affords, and that his favorable action upon the demand and his discharge of the seaman are prerequisite to any recovery under it." *McCrea v. United States*, 294 U.S. 23, 28, 55 S.Ct.

the matter. Rather, it determines whether or not there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, all of the facts must be viewed in the light most favorable to, and all reasonable inferences must be drawn in favor of, the non-moving party. *See id.* at 256, 106 S.Ct. 2505.

The moving party has the burden of showing there are no genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 639 (3d Cir.1996). In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989).

291, 79 L.Ed. 735 (1935). Mr. Barclay contends that, by assisting him in obtaining his passport from the captain, the consular officer made a finding that Mr. Barclay's complaints were justified within the meaning of the statute.

■ The record, however, reveals no such determination. In his communication with the captain regarding Mr. Barclay's departure from the ship, the consular officer did not require the captain to pay one month's wages or to provide Mr. Barley with passage. Rather, the consular officer faxed a memorandum to the captain directing the release of Mr. Barley's passport. *See* Def. Ex. K. On the subject of payment of wages or repatriation to the United States, the memorandum simply states that "Mr. Barclay has acknowledged to us that his departure is not one of 'mutual consent' between himself and the ship's company, and therefore, that he will not receive from the ship's company the relief and repatriation normally available to seamen separated from their vessels." *Id.* No one from the United States Consulate came on board the Ocean City to investigate Mr. Barclay's complaints. *See* Matlack Dep. at 82. Mr. Barclay has not presented any evidence regarding a favorable finding of his complaints regarding unsafe conditions. In sum, there was no investigation of Mr. Barclay's complaints and no consular officer ordered that Mr. Barclay be paid an additional month's wages or receive passage back to the United States. Thus, there was no finding in Mr. Barclay's favor under section 11106, and summary judgment is granted in favor of Keystone on count one.

### B. Intentional Torts

Mr. Barclay brings his claims for intentional infliction of emotional harm and invasion of privacy under the Jones Act, 46 U.S.C.App. § 688,[10] and, in the alternative,

under general maritime law, either under the doctrine of unseaworthiness or as a general maritime tort. He brings his claim for false imprisonment solely under maritime law.

"The Jones Act establishes a uniform system of seaman's tort law," providing a vehicle for a seaman to recover against his employer for personal injuries. *Miles v. Apex Marine Corp.,* 498 U.S. 19, 29, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). The Act specifically incorporates the causes of action provided for railway employees under the Federal Employers' Liability Act and case law developed under both statutes guides subsequent interpretation of either of them. *See Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 547, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); *Ellenwood v. Exxon Shipping Co.,* 984 F.2d 1270, 1281 n. 15 (1st Cir.1993). In general, FELA and the Jones Act are interpreted in accordance with "common-law developments." *Atchison, Topeka & Santa Fe Railway Co. v. Buell,* 480 U.S. 557, 568–69, 569 n. 18, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987) (discussing FELA).

■ Under the doctrine of unseaworthiness, a ship's owner has an absolute duty to furnish a vessel and appurtenances reasonably fit for their intended use. *See Mitchell,* 362 U.S. at 550, 80 S.Ct. 926. A maritime tort is simply one that satisfies "conditions of both location and of connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995); *see also Executive Jet Aviation v. City of Cleveland,* 409 U.S. 249, 268, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). In the absence of a relevant statute, general maritime tort law is "[d]rawn from state and federal sources … [and] is an amalgam of traditional common-law

---

**10.** Section 688(a) provides that

> Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury,

and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply[.]

rules, modifications of those rules, and newly created rules." *E. River S.S. Corp. v. Transamerica Delaval,* 476 U.S. 858, 864–65, 106 S.Ct. 2295, 90 L.Ed.2d 865 (footnote omitted).

Defendant first argues that the Jones Act provides the sole basis for recovery of the plaintiff's tort claims against his employer, relying on the Supreme Court's holding in *Miles* that if a form of recovery is foreclosed by the Jones Act, a seaman cannot seek that type of recovery under general maritime law. *See Miles,* 498 U.S. at 31, 36, 111 S.Ct. 317; *see also Ivy v. Sec. Barge Lines, Inc.,* 606 F.2d 524, 525 (5th Cir.1979) (holding that the Jones Act provides the sole basis for a seaman's recovery against his employer for negligence). Defendant then posits that none of plaintiff's tort claims are cognizable under the Jones Act because they involve solely emotional injury and because the alleged tortious acts by the defendant's employees never placed the plaintiff in the zone of danger. *See Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 557, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994) (holding that a plaintiff could recover for emotional injuries under FELA for a claim of negligent infliction of emotional harm if the plaintiff had been placed in the zone of danger). Defendant thus places Mr. Barclay in a Catch–22, arguing that while plaintiff's sole avenue for relief is the Jones Act, the Act does not recognize his claims.[11]

On the other hand, other courts have suggested, albeit in dicta, that even if a seaman is precluded from recovery under the Jones Act, he or she may assert intentional tort claims under general maritime law. *See Forgione v. United States,* 202 F.2d 249, 252 (3d Cir.1953) (holding that plaintiffs could not proceed on a claim of false imprisonment under the Jones Act, but suggesting that had defendant's actions taken place on navigable waters rather than on shore, plaintiffs could have brought claim as maritime tort); *Wiora v. Harrah's Ill. Corp.,* 68 F.Supp.2d 988, 997 (N.D.Ill.1999) (dismissing Jones Act claims of intentional infliction of emotional harm and invasion of privacy but suggesting that plaintiff may bring these claims in an action for unseaworthiness).

The court finds that the resolution of the defendant's position regarding Jones Act is not required, however, for even assuming the plaintiff may bring his tort claims under either the Jones Act or any theory of maritime law, none of the acts by the defendant constitute a tort.

1. Intentional Infliction of Emotional Harm

■ The conduct underlying Mr. Barclay's claim of intentional infliction of emotional harm simply does not rise to the level necessary to sustain such a claim. Recovery for intentional infliction of emotional distress requires outrageous conduct on the part of the defendant. *See Buell,* 480 U.S. at 566 n. 13, 107 S.Ct. 1410; *see also, e.g. Hoy v. Angelone,* 554 Pa. 134, 720 A.2d 745, 754 (1998) ("Cases which have found a sufficient basis for a cause of action of intentional infliction of emotional distress have had presented only the most egregious conduct."); Restatement (Second) of Torts § 46 cmt. d ("Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.").

■ Construing the facts in Mr. Barclay's favor, the conduct by the defendant's employees aboard the Ocean City does not rise to the level of outrageousness necessary to prevail on a claim of intentional infliction of emotional distress. Mr. Barclay points to the lack of a properly-fitting immersion suit, and harassment by other

---

**11.** In the alternative and assuming that the plaintiff's claims could be brought under the doctrine of unseaworthiness, the defendant argues that Mr. Barclay cannot prevail because he has not suffered any physical injury and was not in the zone of danger.

members of the crew as the bases for this claim. While Mr. Barclay argues that the defendant acted outrageously in refusing to provide him with a jumbo-sized immersion suit, the defendant asserts, and Mr. Barclay does not dispute, that it was not legally required to provide him with a suit because during Mr. Barclay's tour, the Ocean City operated in waters south of 35 degree North latitude and north of 35 degrees South latitude. *See* 46 U.S.C. § 3102(a) (requiring vessels operating in all waters north of 35 degrees North latitude and south of 35 degrees South latitude, other than the Atlantic Ocean, to provide immersion suits). Given that the voyage was confined to waters where a suit was not legally required, the defendant's failure to provide Mr. Barclay with a properly fitting one is not extreme and outrageous conduct that would allow Mr. Barclay to recover for intentional infliction of emotional harm. Similarly, given that very limited type of objectionable behavior that constitutes intentional infliction of emotional harm, the ill-treatment of Mr. Barclay by his superiors and co-workers does not provide a basis for his claim. *See Yballa v. Sea–Land Serv., Inc.,* 919 F.Supp. 1428, 1437–38 (D.Haw.1995) (holding that even if plaintiff could bring his intentional infliction of emotional distress claim under Jones Act, harassment, ridicule and verbal abuse of seaman by superiors was not extreme and outrageous conduct that would support claim); *see also* Restatement (Second) of Torts, § 46, cmt. d ("The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."). Summary judgment is granted in favor of the defendant on count two.

#### 2. False Imprisonment

█ Mr. Barclay was not falsely imprisoned either in Kuwait or in Australia. The tort of false imprisonment "consist[s] of . . . restraint without adequate legal justification." *Forgione,* 202 F.2d at 252; *see also* 32 Am.Jur.2d § 8 (1995). Mr. Barclay's assertion that he was held on the ship against his will is unfounded. He admits that he was never physically prevented from leaving the Ocean City in either Kuwait or Australia. In both instances, he was able to leave the ship and freely returned to it. Although the captain did not return Mr. Barclay's passport until ordered to do so by the consular officer when Mr. Barclay finally left the ship in Australia, Mr. Barclay testified that he was able to leave the ship without his passport on a least one occasion.

In essence, Mr. Barclay equates the defendant's refusal to facilitate his departure with actual confinement. His apprehension regarding the difficulties he would face in leaving the ship without consent and his desire to depart under terms more favorable to him do not constitute a tortious restraint upon his person. He admits that his decision not to depart the ship in Kuwait was based on his concern that he would have wait for five days on the boat basin for a visa for Kuwait and that he would have to pay for his travel back to the United States.[12] In sum, Mr. Barclay was not prevented from leaving the Ocean City in a manner that would provide a basis for a false imprisonment claim. Summary judgment is granted for the defendant on count three.

#### 3. Invasion of Privacy

Mr. Barclay brings two claims of invasion of privacy: count four is based on his allegations that his room aboard the Ocean City was searched without his consent; and count eight is based on his allegation that he was subjected to racially and ethnically derogatory language.

---

**12.** The court rejects Mr. Barclay's argument that, because he was justified in wanting to leave the ship, the defendant's failure to discharge him on mutual consent was a restraint without legal justification. Even assuming that Mr. Barclay's departure was justified, the fact that Keystone refused agree to his departure him did not prevent Mr. Barclay from leaving the Ocean City at all, it only prevented him from leaving on favorable terms.

There are four distinct torts within the rubric of invasion of privacy: (1) intrusion upon seclusion, (2) appropriation of name or likeness, (3) publicity given to private life and (4) publicity placing the person in a false light. *Harris v. Easton Publ'g Co.*, 335 Pa.Super. 141, 483 A.2d 1377, 1384 (1984); *see also* Restatement (Second) of Torts §§ 652 B–E. Both of Mr. Barclay's claims are based on a theory of intrusion of seclusion. "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 621 (3rd Cir.1992) (quoting Restatement (Second) of Torts § 652B); 62A Am. Jur.2d (1990) § 48. A defendant will be found to have intentionally intruded on a plaintiff's privacy only if he believed, or was substantially certain, that he lacked the necessary legal or personal permission to commit the intrusive act. *See O'Donnell v. United States*, 891 F.2d 1079, 1083 (3rd Cir.1989).

Only the captain and the chief engineer entered Mr. Barclay's room for purposes related to their duties upon the ship. For example, the captain entered the room while searching for a jumbo-size immersion suit and to conduct required sanitation inspections. The chief engineer states that he entered the room when Mr. Barclay was not present on two occasions in order to inspect for water leakage. The court finds that these activities, related as they were to legitimate ship-board duties, do not constitute an unwarranted intrusion into Mr. Barclay's privacy.

The general derogatory statements of which Mr. Barclay complains do not support a claim of intrusion upon seclusion. Even assuming that these types of remarks could be considered to be some form of intrusion, none of these statements

were directed to Mr. Barclay and therefore there was no intent to interfere with his solitude or his private affairs.

Thus, summary judgment is granted for the defendant on counts four and eight.

### D. Breach of Contract

The defendant asserts that the plaintiff may not claim any unpaid overtime wages under his contract because he deserted the Ocean City. As a penalty for his act, a deserting seaman forfeits "any part of earned wages." 46 U.S.C. § 11501(1). Desertion occurs when a seaman abandons his ship before the expiration of the term specified in his articles without justification and without the intention of returning. *See Maritime Overseas Corp. v. Ebner*, 697 F.2d 701, 703 (5th Cir.1983). While the parties do not dispute that Mr. Barclay left the Ocean City without the intention of returning prior to the expiration of his contracted term, the parties vigorously dispute whether this action was unjustified. Mr. Barclay argues that his departure was motivated in part by what he perceived to be unsafe conditions aboard the ship, including the jacking gear, the improper method for making potable water and the discharge of oil from the bilge pump. The defendant claims that either these conditions did not exist or they were not unsafe. Thus, there are genuine issues of material fact regarding this claim and the court will not grant summary judgment on count five.

### E. Defamation

Mr. Barclay does not have a claim for slander or libel. In Pennsylvania,[13] a plaintiff has the burden of proving the following elements in order to sustain a claim for defamation:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

---

13. The parties agree that Pennsylvania law applies to the defamation claims.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

42 Pa.C.S.A. § 8343(a). In turn, a defendant bears the burden of proving, when the issue is properly raised:

(1) The truth of the defamatory communication.

(2) The privileged character of the occasion on which it was published.

(3) The character of the subject matter of defamatory comment as of public concern.

*Id.* § 8343(b).

Defamatory utterances constitute slander and defamatory written communications constitute libel. *See Sobel v. Wingard,* 366 Pa.Super. 482, 531 A.2d 520, 522 (1987). Mr. Barclay's claims of defamation rests on various letters sent by the defendant to the U.S. Coast Guard in which they identified him as a deserter and on a report created by the defendant for the MIB stating that he deserted the Ocean City. As a preliminary matter, Mr. Barclay has not submitted evidence of any defamatory utterances by the defendant and accordingly, he cannot prevail on his claim for slander.

■■■ It is for the court to determine whether the communication complained of is capable of a defamatory meaning. *See Maier v. Maretti,* 448 Pa.Super. 276, 671 A.2d 701, 704 (1995). A communication is defamatory "if it ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession." *Id.* Allegations that Mr. Barclay is a deserter is capable of a defamatory meaning, given the serious consequences of such a designation in the maritime world. Nevertheless, Mr. Bar-

clay's claims of libel do not succeed because the defendant's letters to the U.S. Coast Guard are conditionally privileged and Mr. Barclay has not sustained his burden of proving that Keystone abused this privilege.

■■■ A communication is conditionally privileged when it is made upon a proper occasion for a proper motive and based on reasonable cause. *See Baird v. Dun & Bradstreet,* 446 Pa. 266, 285 A.2d 166, 171 (1971); *Beckman v. Dunn,* 276 Pa.Super. 527, 419 A.2d 583, 587 (1980). A proper occasion is one where "(1) some interest of the person who publishes defamatory matter is involved; (2) some interest of the person to whom the matter is published or some other third person is involved; or (3) a recognized interest of the public is involved." *Id.,* 419 A.2d at 588. It is for the court to determine whether a communication is conditionally privileged. *See Baird,* 285 A.2d at 171.

■■■ Here, Keystone's communications to the Coast Guard regarding Mr. Barclay's departure from the Ocean City were made for a proper purpose, on a proper occasion, and were limited to parties who had an interest in the matter. The Coast Guard was investigating whether Mr. Barclay deserted the Ocean City and whether the vessel was unseaworthy. The communications by the defendant were related to this investigation. Both the defendant and the Coast Guard had an interest in determining whether or not Mr. Barclay's departure was, in fact, desertion, and thus, this was a proper occasion for the communication. *Cf. Beckman,* 419 A.2d at 588 (finding a proper occasion resulting in conditional privilege where professor defended decision to fail Ph.D. candidate in an allegedly defamatory letter to university Ombudsman who was investigating candidate's complaint that the decision was unfair). While there are genuine issues regarding whether or not Mr. Barclay did desert the Ocean City, Keystone's position that he did was not unreasonable.

In sum, Keystone's communications to the Coast Guard, setting forth its position that Mr. Barclay deserted its vessel, made in connection with an investigation surrounding Mr. Barclay's departure, and based on reasonable cause, are subject to a conditional privilege.[14]

A plaintiff may defeat a claim of conditional privilege by showing abuse of the privilege. An abuse of a conditional privilege occurs when the publication is made with actual malice or negligence. *See Beckman,* 419 A.2d at 588. Actual malice is a wrongful act done intentionally without just cause or excuse, or generated from reckless or wanton disregard of another's rights. *Id.* at 588 n. 3. Whether or not the privilege has been abused is a question of fact. *See Simms v. Exeter Architectural Prods.,* 916 F.Supp. 432, 436, (M.D.Pa.1996). However, in order to defeat a motion for summary judgment, a plaintiff must set forth evidence of abuse of privilege. *See Maier,* 671 A.2d at 706. Mr. Barclay has not produced any evidence to show that the defendant abused the conditional privilege. While he argues that the acted maliciously in calling him a deserter, this assertion is based only on the fact that he disagrees with the defendant's characterization: he does not produce any evidence of malice. Certainly, the circumstances surrounding Mr. Barclay's departure are in dispute. However, given that he left the Ocean City without the consent of the captain, and given that the parties take widely divergent views regarding whether this act was justified, as noted previously, the defendant's position that Mr. Barclay deserted is not unreasonable. Mr. Barclay also argues, in the alternative, that the defendant was required by law to send the Coast Guard only the ship's log and his articles of agreement, and any other communications with that agency, including the letters and the report, exceeded any conditional privilege. The crux of the Coast Guard's investigation was the nature of Mr. Barclay's departure from the Ocean City and whether or not his act was justified. The fact that Keystone sent materials setting forth its position to the agency does not make its act malicious or beyond the scope of the privilege. Mr. Barclay has not produced any evidence that Keystone sent the information to anyone other than Coast Guard personnel. The defendant's conditional privilege was not abused.

As to the MIB report, the defendant has submitted uncontested evidence that it never actually submitted the report to the Bureau. Because the plaintiff cannot prove that defendant's MIB report was ever published, this report cannot be a basis for his libel claim. In so far as Mr. Barclay alleges that the creation of the draft report provides grounds for defamation, the court finds that the report is subject to a conditional privilege. Communications among upper managers regarding an employee's job performance are conditionally privileged. *See e.g., Maier,* 671 A.2d at 706; *Rutherfoord v. Presbyterian–Univ.,* 417 Pa.Super. 316, 612 A.2d 500, 507 (1992). The draft of the MIB report was placed in Keystone's file and there is no evidence that it has been circulated to anyone other than Keystone personnel. Thus, the draft report is conditionally privileged.

Summary judgment is granted for the defendant on counts six and seven.

---

**14.** In the alternative, Keystone asserts that its letters to the Coast Guard are absolutely privileged. In Pennsylvania, communications by an employer regarding an employee's termination are absolutely privileged. *See Yetter v. Ward Trucking Corp.,* 401 Pa.Super. 467, 585 A.2d 1022, 1024 (1991). The purpose of this privilege is to encourage an employer to communicate with an employee about the reasons for the discharge by eliminating the risk that the employer may be liable for defamation. *See id.* Mr. Barclay argues, and the court agrees, that the absolute privilege does not apply to the present situation. Here, Mr. Barclay was not discharged by his employer, and so the absolute privilege's purpose of encouraging frank communication between employer and employee regarding the circumstances of the termination is not implicated.

## III. Conclusion

Summary judgment is granted in favor of the defendant on counts one, two, three, four, six, seven and eight of the plaintiff's first amended complaint. There is a genuine issue of material fact regarding count five and the court denies summary judgment on this claim.

An appropriate order follows.

### ORDER

**AND NOW,** this 11th day of January, 2001, upon consideration of the defendant's motion for summary judgment and other submissions of the parties, it is hereby **ORDERED** that the motion is **GRANTED** as to counts one, two three, four, six, seven, and eight and **DENIED** as to count five.