# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
March 19, 2013

No. 12-30725

Lyle W. Cayce
Clerk

IN RE: IN THE MATTER OF THE COMPLAINT OF BERTUCCI
CONTRACTING CO., L.L.C., as Owner of the M/V SHARON GAIL, for
Exoneration from or Limitation of Liability

BERTUCCI CONTRACTING COMPANY, L.L.C., as owner of the M/V Sharon
Gail,

Petitioner-Appellant

v.

DANIEL P. WAGNER; SHIRLEY J. WAGNER; MICHAEL J. APPLETON;
MICHELLE H. APPLETON, individually and on behalf of their minor
children, H. A. and M.A.; MARIA NATAL; ET AL,

Claimants-Appellees

IN RE: IN THE MATTER OF THE COMPLAINT OF NASDI, L.L.C., as
owner pro hac vice and operator of the OU141, for Exoneration from and/or
Limitation of Liability

NASDI, L.L.C., as owner pro hac vice and operator of the OU141,

Petitioner-Appellant

v.

DANIEL P. WAGNER; SHIRLEY J. WAGNER; MARIA NATAL; DAVID
CANNON; KATIE CANNON; ET AL,

Claimants-Appellees

No. 12-30725

---

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:12-CV-664

---

Before KING, SOUTHWICK, and GRAVES, Circuit Judges.

PER CURIAM:[*]

This consolidated limitation of liability action arises out of the demolition of the original Interstate 10 Twin Span Bridges across Lake Pontchartrain. The State of Louisiana contracted with Petitioners-Appellants NASDI, L.L.C., and Bertucci Contracting Co., L.L.C., for the demolition and removal of parts of the Twin Span Bridges. Claimants-Appellees are affected residents of the Lakeshore Estates Subdivision and other residential areas who brought a state-court action alleging nuisance as a result of the noise, dust, and vibrations caused by Appellants' activities. In the same state action, Appellees also alleged that the Appellants' vessels trespassed onto their waterfront property, causing damage. Appellants subsequently filed limitation actions in the Eastern District of Louisiana under the Limitation of Liability Act, 46 U.S.C. §§ 30501, *et seq*. The district court preliminarily enjoined the state action, but later granted in part and denied in part Appellees' motions to dismiss the limitation actions for lack of subject matter jurisdiction. In separate orders the district court also relaxed and lifted an injunction with respect to certain claims, and denied reconsideration. Appellants appeal the district court's orders. For the following reasons, we vacate the district court's orders and remand for consideration of Appellees' allegedly interwoven land- and vessel-based nuisance claims.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

2

No. 12-30725

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.    Hurricane Katrina

The original Interstate 10 Twin Span Bridges ("Twin Spans") crossed Lake Pontchartrain and connected the Lake's southern and northern shores. In 2005, Hurricane Katrina made landfall in southeast Louisiana and severely damaged the Twin Spans. The Louisiana Department of Transportation and Development initially was tasked with repairing the Twin Spans. Because of the extensive damage caused by Hurricane Katrina, the State of Louisiana ultimately decided that the Twin Spans were too vulnerable to storm surges and decided to replace them with two new bridges. Work on the replacement bridges began on July 13, 2006. The first bridge opened on July 9, 2009, and the second on April 7, 2010. The Twin Spans then were permanently closed to traffic.

### B.    Demolition of the Twin Spans

The State of Louisiana contracted with various companies to effectuate the demolition and removal of the Twin Spans and the repurposing of the associated concrete. This process began in May 2011, and was expected to generate in excess of 244,000 tons of concrete from the Twin Spans. As part of the Twin Spans' demolition and removal, barges and tugboats transported slabs of concrete to a "staging area" just north of Lake Pontchartrain. The staging area was located on an undeveloped piece of property accessible from the Lake via a canal. Vessels carried concrete through the canal. On their way they passed the Lakeshore Estates Subdivision and other residential areas ("Lakeshore Estates"), which were adjacent to the staging area. In so doing, the vessels allegedly trespassed on part of the canal purportedly owned by residents of the Lakeshore Estates. The currents from those vessels also allegedly eroded and caused damage to boathouses and bulkheads owned by residents of Lakeshore Estates.

3

According to testimony adduced in the state court and to depositions filed as a part of the motion for reconsideration, once the concrete arrived at the staging area, the tugboats rammed the barges onto shore and kept them there by revving their engines anywhere from 30 minutes to several hours. While tugboats held the barges in place, large slabs of concrete were unloaded to shore. This process entailed dragging the concrete off the metal barges or picking up the concrete by crane and dropping it back on the barges to break it into smaller pieces. After the concrete was unloaded, industrial crushers and grinders broke it down or crushed it into smaller parts, and sorted it by size. This again involved picking up slabs of concrete and repeatedly smashing them until they were reduced to the desired size. Once empty, the barges would be cleaned. This involved pushing any remaining debris from the barges into the water. This debris also allegedly entered part of the Lakeshore Estates.

After being transported from the Twin Spans, unloaded, and crushed down, some of the concrete was packed into geo-textile "mattresses." These mattresses initially were stored at the staging area, but later were loaded back onto the barges and transported to Lake Borgne to be used for shoreline protection. Other concrete from the staging area was used in the creation of an artificial reef and construction of a fishing pier.

Aside from allegedly being very loud, the entire process purportedly also created dust at the point at which the concrete was unloaded and when the concrete was crushed, which then settled on the Lakeshore Estates. The activities at the staging area also allegedly created vibrations that disturbed and damaged the Lakeshore Estates.

## C.    Appellants' Operations

The State contracted with Petitioners-Appellants NASDI, L.L.C. ("NASDI"), and Bertucci Contracting Co., L.L.C. ("Bertucci") (NASDI and Bertucci are collectively referred to herein as "Shipowners"), to help complete the

process of demolishing and removing the Twin Spans and repurposing the concrete remains. The Louisiana Department of Transportation and Development contracted with NASDI to demolish and remove parts of the Twin Spans and transport them to the staging area. Bertucci entered into a contract with the Louisiana Office of Coastal Protection and Restoration to break up the concrete, place it into mattresses, and transport the mattresses to Lake Borgne. Bertucci also regularly transported light and heavy equipment to the staging area by boat and barge. NASDI sub-contracted with Bertucci to assist in breaking down the concrete at the staging area.

## D.     The Residents' State-Court Action

Claimants-Appellees ("Residents") are residents of the Lakeshore Estates. On January 17, 2012, Residents filed a Petition for Declaratory Judgment, Injunctive Relief, and Class Action Lawsuit Related to Liability and Damages in the Civil District Court for the Parish of Orleans. Residents' petition asserted that the Shipowners' activities created noise, dust, and vibrations that resulted in personal injury, property damage, and nuisance to nearby residential areas. Residents further alleged that the Shipowners' vessels trespassed into private waterways near the staging area causing further damage.

Residents then filed a Rule to Show Cause to obtain a hearing date on their request for a preliminary injunction. The state court set a preliminary injunction hearing date for March 9, 2012. That date was later delayed to March 20, 2012, to provide Shipowners a hearing on various exceptions filed in response to Residents' petition. At the March 9, 2012, exceptions hearing, the state court denied all of the Shipowners' exceptions, save for an exception related to venue, which it took under advisement, but later denied.

## E.     The Shipowners' Limitation Actions

On March 9, 2012, Bertucci filed a limitation of liability action in the Eastern District of Louisiana pursuant to the Limitation of Liability Act

No. 12-30725

("Limitation Act"), 46 U.S.C. §§ 30501, *et seq.* The Limitation Act permits a vessel's owner to limit its liability to "the value of the vessel and pending freight," and allows a district court to enjoin state-court proceedings.[1] *Id.* §§ 30505, 30511; *see also* Fed. R. Civ. P. Supp. F(3). NASDI followed suit on March 14, 2012. The district court enjoined Residents from prosecuting their state-court action and consolidated the two limitation actions.

On March 18, 2012, Residents filed an Emergency Motion to Limit Stay, Lift Stay, and/or Set Preliminary Injunction Hearing. Residents sought to modify or limit the district court's stay to obtain pending injunctive relief in state court. The district court held a status conference on March 19, 2012, and denied the Residents' motion without prejudice to the Residents' right to bring their motion again at a later date.

On March 26, 2012, Residents moved to dismiss the Shipowners' limitation actions for lack of subject matter jurisdiction and/or to lift the stay. The district court granted their motions in part and denied them in part. The district court first construed the state-court petition to include separate "land-based" and "vessel-based" claims. It then ruled that admiralty jurisdiction did not attach to what it termed the land-based claims, "i.e., the noise, dust, and vibrations allegedly emanating from the concrete breaking operation at the staging area." The court also (1) declined to exercise supplemental jurisdiction over what it deemed the land-based claims; and (2) held that admiralty jurisdiction attached to vessel-based claims for trespass by barges and tugboats traveling on the Residents' side of the canal. In a separate order, the court lifted the injunction

---

[1] Importantly, the Limitation Act does not, itself, confer federal jurisdiction; courts instead look to whether they can exercise admiralty jurisdiction over the claims raised in the limitation complaint. *See Guillory v. Outboard Motor Corp.*, 956 F.2d 114, 115 (5th Cir. 1992) (per curiam).

as to the land-based claims.[2]  NASDI filed a motion for reconsideration, which the district court summarily denied.

Shipowners timely filed an interlocutory appeal of the district court's dismissal of their nuisance-related limitation actions for lack of subject matter jurisdiction, and the court's lifting of its stay as to those claims.[3]

## II.  DISCUSSION

### A.  Standard of Review

"When addressing a dismissal for lack of subject matter jurisdiction, we review application of law de novo and disputed factual findings for clear error." *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 376 (5th Cir. 2009).  "[A] motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

We review a district court's decision to lift a stay for abuse of discretion. *In re Tetra Applied Techs. L P*, 362 F.3d 338, 340 (5th Cir. 2004).

### B.  Subject Matter Jurisdiction

The district court held that it had subject matter jurisdiction over the trespass claims, but that it lacked subject matter jurisdiction over nuisance claims relating to noise, dust, and vibrations because those claims were limited to land-based activities outside the court's admiralty jurisdiction.  According to the district court, "the noise, dust, and vibrations ha[d] nothing to [do] with acts occurring on vessels on navigable waters" because the "delivery of the concrete,

---

[2] The district court did not dismiss the Shipowners' limitation actions against the Residents' trespass claims and this decision has not been appealed.

[3] Shipowners first filed a notice of appeal on July 6, 2012.  After their motion for reconsideration was summarily denied, Shipowners filed a second notice of appeal.

standing alone, did not create the noise, dust, and vibrations that allegedly emanate[d] from the staging area." Put another way, "the land-based claims did not arise until the separate act of crushing commenced on land." On appeal, Shipowners argue that "[t]he district court either overlooked or ignored the [Residents'] own allegations in their petition that all defendants, including the vessel-related defendants, proximately caused the dust, noise, vibrations, and nuisances that resulted in alleged personal injury and property damage to the [Residents]."

Simply put, the dispute is about what the Residents alleged. The district court viewed this case as involving two sets of claims—vessel-based trespass claims and land-based nuisance claims. Shipowners disagree and contend that Residents have alleged three sets of claims—vessel-based trespass claims, land-based nuisance claims, and *vessel*-based nuisance claims. We agree with Shipowners that the district court's failure to recognize a separate category of vessel-based nuisance claims was error. Moreover, because the district court's opinion was predicated upon its understanding of the nuisance claims as entirely land-based, it is necessary to vacate the district court's orders to permit it to reconsider its jurisdiction over the Shipowners' limitation actions.

1.    Vessel-based nuisance claims

A district court may dismiss a claim for lack of subject matter jurisdiction on the basis of "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. May 1981). Our standard of review varies depending on which basis the district court relies.

> [I]f the court's decision rests on one of the first two of these . . . our review is limited to determining whether the district court's application of the law is correct and, if the decision is based on undisputed facts, whether those facts are indeed undisputed. But if

the court has relied in addition on its own determination of disputed factual issues, we must then review those findings as we would any other district court resolution of factual disputes—we must accept the district court's findings unless they are "clearly erroneous."

*Id.* (citation omitted).

The district court did not explicitly state on which basis it relied for its conclusion that the Residents' nuisance claims arose purely out of land-based activities. Although it stated that "[a] fair reading of [the Residents'] state-court petition reveals that the bulk of their case concerns obtaining relief under state law from the noise, dust, and vibrations emanating from the onshore concrete crushing operation," it also—in a footnote—referred to a Resident's deposition transcript. Regardless of why the district court did not address the vessel-based nuisance claims, our review of the record makes clear that such claims were alleged.

We begin our analysis with the parties' pleadings. NASDI's amended limitation complaint provided that "[Residents] allege personal injury, property damage, nuisance and trespass as a result of the operations of NASDI, including but not limited to the Vessels." It also stated that "[Residents] have alleged that the Vessels operated by NASDI have trespassed on their property, and the Vessels' existence in the staging area . . . constitutes a nuisance." Bertucci's limitation complaint stated that "[Residents] allege that Bertucci has generated excessive levels of noise and high levels of vibrations and movement of the ground while providing barge service."

The Residents' allegations appear in their state-court petition (which was attached to the Shipowners' limitation complaints) and do not strictly distinguish between the sources of nuisance. "The work performed by NASDI [and] . . . Bertucci . . . produce[d] extremely high levels of concrete dust and particulate matter composed of quartz and other forms of crystalline silica . . . . excessive levels of noise . . . . [and] high levels of vibrations and movement of the

9

ground." "Uncontrolled dust becomes airborne and is blown from the staging area" and "accumulates on the properties of [Residents]." "The vibrations, movement of the ground, and/or pile driving has resulted in cracks at various points in the concrete slabs and homes of [Residents]."

Considering the Shipowners' limitation complaints alone, it is clear that Shipowners expressly asserted that they are the subject of nuisance claims in state court as a result of both land- and vessel-based activities. *See Life Partners Inc. v. United States*, 650 F.3d 1026, 1029 (5th Cir. 2011) (review of dismissal for lack of subject matter jurisdiction "takes as true all of the allegations of the complaint and the facts set out by the plaintiff"). While the state-court petition in various places references the noise, dust, and vibrations coming from the staging area, other parts of the petition do not distinguish between land- and vessel-based activities. *See Ramming*, 281 F.3d at 161 (dismissal for lack of subject matter jurisdiction only appropriate where it is certain that a plaintiff cannot prove any set of facts in support). Moreover, even where the petition only refers to the staging area, it is unclear whether this solely refers to the concrete crushing or also the unloading of the concrete from the barges. Courts in similar contexts have opted not to allow parties to artificially manipulate the scope of their allegations to avoid limitation. *See In re Shell Oil Co.*, 780 F. Supp. 1086, 1090 (E.D. La. 1991) ("Perhaps recognizing that their claims against Shell would not escape the umbrella of limitation, the moving claimants have carefully worded certain claims so as to avoid allegations that Shell's liability flows from its 'ownership' or 'control' of the [vessel]. Nevertheless, analysis of their claims leads to the inescapable conclusion that, in the event that claimants are successful in holding any of the Shell entities accountable, it may well be as 'owner' of the vessel . . . ." (footnotes omitted)).

Evidence beyond the pleadings confirms our conclusion as to the nature of the Residents' claims. When Residents brought their motion to dismiss and

modify the stay, Shipowners responded by arguing that Residents alleged not only nuisance from concrete crushing operations on land, but also that the vessels "constituted a nuisance," because of "the daily transport and discharge of concrete by barge and tug at the staging area." NASDI's motion for reconsideration also included testimony by various Residents showing that they suffered from the noise, dust, and vibrations caused by overlapping land- and vessel-based activities.[4]

Accordingly, the district court erred in failing to recognize the Residents' vessel-based nuisance claims, and the Shipowners' efforts to limit damages as a result thereof. Thus, at the very least, the district court was required to consider whether it had jurisdiction over the vessel-based nuisance claims, and whether those claims fell within the scope of the Limitation Act.

2.    Land-based nuisance claims

Shipowners not only challenge the district court's failure to recognize the Residents' vessel-based nuisance claims, but also assert that the district court erred in dismissing the land-based nuisance claims because "the claims asserted against [them] cannot be neatly separated into distinct sets of claims." We do not express any opinion as to whether the Residents' vessel-based nuisance claims can be separated from their land-based counterparts. We agree, however, that should the district court conclude that it had jurisdiction over the vessel-based nuisance claims, its jurisdictional analysis of the land-based nuisance claims might be affected.

"The Limitation of Liability Act does not confer jurisdiction upon federal courts." *Guillory*, 956 F.2d at 115; *see also In re Silver Slipper Casino Venture LLC*, 264 F. App'x 363, 365 (5th Cir. 2008) (unpublished). Instead, we look to whether the district court had admiralty jurisdiction over each claim. *Guillory*,

---

[4] The Residents' brief concedes that "vessel-based activities also result[ed] in dust, noise, and vibrations."

956 F.2d at 115; *see also Luera v. M/V Alberta*, 635 F.3d 181, 189 (5th Cir. 2011) (admiralty jurisdiction is a form of subject matter jurisdiction); *Powell v. Offshore Navigation, Inc.*, 644 F.2d 1063, 1069 (5th Cir. Unit A May 1981) (noting that "each claim is at least within the bounds of federal admiralty jurisdiction"); *Peytavin v. Gov't Emps. Ins. Co.*, 453 F.2d 1121, 1127 (5th Cir. 1972) (summary calendar). Where an action includes both maritime and non-maritime claims, supplemental jurisdiction may be available as to the latter. 28 U.S.C. § 1367; *see also Loeber v. Bay Tankers, Inc.*, 924 F.2d 1340, 1345 (5th Cir. 1991) (per curiam).

Pursuant to the test articulated by the Supreme Court in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, a party invoking federal admiralty jurisdiction "must satisfy conditions both of location and of connection with maritime activity." 513 U.S. 527, 534 (1995). To satisfy the location requirement a party must show that "the tort occurred on navigable water or [that an] injury suffered on land was caused by a vessel on navigable water."[5] *Id.* Satisfaction of the connection requirement requires a party to show, first, that "the general features of the type of incident involved" had a "potentially disruptive impact on maritime commerce." *Id.* (internal quotation marks and citations omitted). Second, a party seeking to satisfy the connection requirement must show that "the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Id.* (internal quotation marks and citation omitted).

Applying that test, the district court concluded that it did not have admiralty jurisdiction over the land-based nuisance claims. We agree that,

---

[5] The second disjunctive exists by virtue of the Admiralty Extension Act, which provides that "[t]he admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land." 46 U.S.C. § 30101(a).

considered in isolation from the other claims at issue here, admiralty jurisdiction would not extend to nuisance claims arising out of concrete crushing operations at the staging area. However, where an injury is the result of both land- and vessel-based activity, the *Grubart* test is modified. In particular, *Grubart*'s "substantial relationship test is satisfied when at least one alleged tortfeasor was engaging in activity substantially related to traditional maritime activity and such activity is claimed to have been a proximate cause of the incident." *Id.* at 541; *see Scarborough v. Clemco Indus.*, 391 F.3d 660, 665 (5th Cir. 2004) (finding second part of *Grubart*'s connection requirement satisfied because "one of the tortfeasors in this case was involved in traditional maritime activity").[6] Even if the district court determines that admiralty jurisdiction does not extend over the land-based nuisance claims by virtue of the vessel-based nuisance

---

[6] We recognize that our interpretation of *Grubart* is not without controversy. *See Raffray v. Gulf Logistics, LLC*, No. 10-1017, 2010 WL 5055849, at *6 n.7 (E.D. La. Dec. 2, 2010) (unpublished) (noting divergence of views in academic literature). Our decision in *Scarborough* has been challenged for misinterpreting *Grubart*. *See generally* David W. Robertson, *Admiralty Jurisdiction Over One Co-Tortfeasor Cannot Effectuate Admiralty Jurisdiction Over Another*, 37 J. Mar. L. & Com. 161, 168 (2006) (arguing that *Scarborough* misinterpreted *Grubart* to stand for the proposition that "the existence of admiralty jurisdiction over a plaintiff's claims against one of several co-tortfeasors calls for the exercise of admiralty jurisdiction over the claims against all of the tortfeasors"). *But see* Thomas C. Galligan, Jr., *The Admiralty Extension Act at Fifty*, 29 J. Mar. L. & Com. 495, 505 (1998) ("Critically, the Court's decision in *Grubart* implies that in a multiple concurrent tortfeasor case, where there is maritime jurisdiction over a maritime joint tortfeasor, there is maritime jurisdiction over the land-based tortfeasor as well."); *see also White v. Sabatino*, 526 F. Supp. 2d 1143, 1156 (D. Haw. 2007) ("Even if the County Defendants' activities are land-based . . . consideration of such activity does not defeat admiralty jurisdiction when another tortfeasor was engaged in activity substantially related to a traditional maritime activity and such activity is claimed to be a proximate cause of Plaintiff's injury."); *AGIP Petrol. Co. v. Gulf Island Fabrication, Inc.*, 920 F. Supp. 1330, 1337–38 (S.D. Tex. 1996); *In re Chi. Flood Litig.*, 719 N.E.2d 1117, 1124–29 (Ill. App. Ct. 1999); Charles Alan Wright et al., 14AA Federal Practice & Procedure § 3676.1 (4th ed. 2012) ("Given that Congress opted against the bright line of the locality test when it adopted the Admiralty Extension Act, it is only fair that land-based tortfeasors are subject to admiralty jurisdiction, as land-based victims have been.") We leave it to the district court to determine the extent to which this case mirrors *Scarborough*, should the district court determine that it has jurisdiction over the vessel-based nuisance claims.

No. 12-30725

claims (as to which we express no opinion), the district court could still  exercise supplemental jurisdiction over the land-based claims.  *See Loeber*, 924 F.2d at 1345 ("[A] federal court entertaining a maritime claim has the discretion to adjudicate non-federal claims derived from a common nucleus of operative fact . . . ." (quoting *Feigler v. Tidex, Inc.*, 826 F.2d 1435, 1439 (5th Cir. 1987))).

Having not recognized the presence of vessel-based nuisance claims, the district court also did not consider how those claims might affect its jurisdiction over the remaining claims.[7]  Such consideration is crucial given the Shipowners' allegations that the nuisance claims closely are intertwined.  We remand this matter to the district court to consider in the first instance.

## C.    Limitation Act

Pursuant to the Limitation Act, a court "shall enjoin the further prosecution of any action or proceeding against the plaintiff or the plaintiff's property with respect to any claim subject to limitation in the action."  Fed. R. Civ. P. Supp. Admiralty & Maritime Claims R. F(3).  Claims subject to limitation "are those arising from any . . . thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner."  46 U.S.C. § 30505(b).  However, "[t]he history of application of the Limitation Act

---

[7] Although we do not reach whether there is admiralty jurisdiction over the vessel-based nuisance claims, we note that Shipowners make a colorable argument in favor of jurisdiction.  For example, the complained-of dust, noise, and vibrations from the vessels were an "injury [that] was caused by a vessel in navigable water." *Scarborough*, 391 F.3d at 663 (quoting *Grubart*, 513 U.S. at 534).  We also can imagine situations in which such irritants would have the potential to disrupt maritime commerce, either by causing injury or inhibiting other vessels from operating in the canal or on the Lake. *See Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119 (5th Cir. 1995) (en banc) (onboard injury can disrupt maritime commerce by delaying the vessel's primary activity).  Finally, there is little question that "unloading of [a] ship's cargo"—in this case, concrete—is a "traditional maritime activity." *Drachenberg v. Canal Barge Co.*, 571 F.2d 912, 917 (5th Cir. 1978); *see also Moser v. Tex. Trailer Corp.*, 623 F.2d 1006, 1009 (5th Cir. 1980) (describing transportation of cargo as a traditional maritime activity).

14

No. 12-30725

reflects the limiting of liabilities arising out of damage to cargo or goods, injuries or damages resulting from collision, salvage claims, fires, personal injury suits by seamen, and damages to structures or persons on land." *In re Transporter Marine, Inc.*, 217 F.3d 335, 338–39 (5th Cir. 2000) (concluding that regulatory penalties resulting from Coast Guard proceedings are not "among the kinds of maritime misfortune that are subject to the Limitation Act"); *see also Magnolia Marine Transp. Co. v. Laplace Towing Corp.*, 964 F.2d 1571, 1575 (5th Cir. 1992) (noting that Limitation Act "is directed at maritime misfortunes").

The district court premised its decision to allow some of the Residents' claims to proceed in state court on its clear division between land-based nuisance claims and vessel-based trespass claims. As with the district court's jurisdictional analysis, the fact that the Residents' allegations also include vessel-based nuisance claims calls into question the district court's rationale for lifting the injunction of the nuisance claims. We also are skeptical of the Residents' contention that they are able to distinguish between the causes of nuisance. The dust, noise, and vibrations complained of originated from two sources—the transportation and unloading of concrete at the staging area, and the subsequent crushing of the concrete. As the Residents' brief itself acknowledges, "the concrete-crushing activities at the staging area and the vessel activities may have occurred during the same or similar time periods." During oral argument, counsel for Residents also agreed that if this matter proceeds to trial, Shipowners would be entitled to ask that the jury apportion damages between injury caused by concrete crushing and the vessels.

It thus is entirely unclear whether—in view of the potential difficulty of apportioning as to any individual Resident the damages originating from land- and opposed to vessel-based activities—the nuisance claims can separately be adjudicated. Accordingly, on remand, the district court should consider whether the land- and vessel-based nuisance claims truly are intertwined and, if so,

15

whether lifting its stay as to some of those claims is appropriate.[8] *See Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 209–10 (5th Cir. 2009) ("When a shipowner files a petition under the Limitation of Liability Act, all other suits against the shipowner are automatically stayed, and all claims should be litigated in the limitation proceeding. But if a plaintiff makes certain stipulations, including that he will not enforce any judgment against the shipowner until the court has ruled on the limitation petition, the court presiding over the limitation action may stay that action and allow the merits actions to proceed." (footnotes omitted)); *see also In re ADM/Growmark River Sys., Inc.*, 234 F.3d 881, 885–86 (5th Cir. 2000).

### III. CONCLUSION

For the aforementioned reasons, we vacate the district court's (1) dismissal of the land-based claims relating to noise, dust, and vibrations for lack of subject matter jurisdiction, (2) relaxing and lifting of the stay with respect to what it termed the "land-based claims," and (3) denial of reconsideration. On remand, the district court is to consider whether, in light of our determination that the Residents' allegations include vessel-based nuisance claims, the district court had admiralty or supplemental jurisdiction over the vessel-based nuisance

---

[8] We are cognizant of the well-known tension between the Limitation Act and 28 U.S.C. § 1333(1)'s "saving to suitors" clause ("Saving Clause"). *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 448 (2001); *see also Odeco Oil & Gas Co., Drilling Div. v. Bonnette*, 74 F.3d 671, 674 (5th Cir. 1996). The Saving Clause provides that federal courts have original and exclusive jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction," but also "saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333(1). We have recognized that claims may proceed outside a limitation action "(1) when the total amount of the claims does not exceed the shipowner's declared value of the vessel and its freight, and (2) when *all claimants* stipulate that the federal court has exclusive jurisdiction over the limitation proceeding, and that the claimants will not seek to enforce a damage award greater than the value of the ship and its freight until the shipowner's right to limitation has been determined by the federal court." *Odeco Oil*, 74 F.3d at 674. Counsel for Residents represented that there were, as yet, no stipulations in this case, and counsel for Shipowners agreed that this case did not yet require consideration of the Saving Clause. We thus do not address it.

claims. The district court also is to consider anew whether it had admiralty jurisdiction over the Residents' land-based nuisance claims. If the district court concludes that it does not have admiralty jurisdiction, it also should consider whether it would be appropriate to exercise supplemental jurisdiction over the seemingly intertwined land-based nuisance claims. Similarly, it should consider whether the Limitation Act requires maintaining a stay over the entire state-court proceeding or if some of the claims can proceed. Each party shall bear its own costs.

VACATED and REMANDED with instructions.